OPINION
{¶ 1} The defendant-appellant, Darrell Port ("Port"), appeals the October 5, 2005, Judgment of conviction and sentence entered in the Court of Common Pleas, Marion County, Ohio.
 {¶ 2} On May 6, 2005, Sheri Gorre ("Gorre") reported to the Marion Police Department that she had been assaulted two days earlier by her former boyfriend, Port. On May 9, 2005, Gorre went to the Marion General Hospital Emergency Room as she was advised to do since she claimed that Port had headbutted her. The doctor concluded that Gorre received a broken brow bone and a broken nose which would have required a heavy blow to her face.
 {¶ 3} Over the next ten days, the Marion Police Department made multiple attempts to locate Port to interview him regarding the alleged assault. On May 16, 2005, Gorre called the Marion Police Department to report that she was having further problems with Port. Marion Police Officer Rob Musser went to Gorre's house, spoke with her, and obtained a description of Port's vehicle. As a result, Officer Musser stopped Port's vehicle at 10:26 p.m. approximately two blocks from Gorre's house.
 {¶ 4} When Officer Musser stopped Port's vehicle he approached the driver's side and immediately noticed that there was a strong odor of burnt marijuana coming from the car. Therefore, he called for an additional officer. Within a few minutes, Major Randy Caryer arrived and approached the passenger's side of the vehicle. Port was in the driver's seat and his current girlfriend, Starla Mullins was in the front passenger seat.
 {¶ 5} Officer Musser and Major Caryer both shined their flashlights into the vehicle while speaking with Port. In addition, the lights from one of the police cruisers helped partially illuminate the inside of Port's vehicle. Both officers were making special efforts to make sure that Port did not have any weapons and to follow safety precautions during the stop.
 {¶ 6} Ultimately, Officer Musser asked Port to get out of the vehicle. As Port complied with the request, Major Caryer reported to Officer Musser that there was a knife on the driver's seat that Port had been sitting on during the stop. The knife was a Winchester seven and one half inch lock blade pocket knife that was in the open position. Officer Musser escorted Port to the back of the vehicle and patted him down for additional weapons. No other weapons were found. Major Caryer seized the knife from Port's vehicle. Port was then asked about the knife. He admitted that the knife was his and claimed that he had the knife on the car seat for protection against David Daniels.
 {¶ 7} On May 19, 2005, Port was indicted with one count of Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree and one count of Carrying a Concealed Weapon in violation of R.C. 2923.12(A), a felony of the fourth degree.
 {¶ 8} On August 29, 2005, a jury trial was commenced. During the trial, the State presented the testimony of ten witnesses, including Gorre, who recanted some of her allegations regarding the assault charge by stating that the broken bones in her face were the result of her headbutting Port. Port did not present any evidence at trial. On August 30, 2005, the jury returned a verdict of not guilty for Felonious Assault and guilty for Carrying a Concealed Weapon.
 {¶ 9} On October 5, 2005, the Judgment of conviction and sentence was filed sentencing Port to seventeen months in prison and a term of three years of post release control by the parole board.
 {¶ 10} On November 2, 2005, Port filed a notice of appeal raising the following assignments of error:
 Assignment of Error 1 THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR CARRYING A CONCEALED WEAPON Assignment of Error 2 DEFENDANT-APPELLANT'S CONVICTION FOR CARRYING A CONCEALED WEAPON IS CONTRARY TO THE MANIFEST WEIGHT OF EVIDENCE Assignment of Error 3 DEFENDANT-APPELLANT RECEIVED PREJUDICIALLY INEFFECTIVEASSISTANCE OF COUNSEL IN VIOLATION OF HIS SIXTH AND FOURTEENTHAMENDMENT RIGHTS, AS WELL AS HIS RIGHTS UNDER SECTION 10, ARTICLEI, OHIO CONSTITUTION
 {¶ 11} Ports's first and second assignments of error focus on the sufficiency and manifest weight of the evidence in this case. These two assignments of error shall be considered together because both require a close examination of the evidence. Port specifically alleges that the State failed to prove beyond a reasonable doubt that the knife found on the seat of Port's vehicle was concealed or was a deadly weapon.
 {¶ 12} In State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus, the Ohio Supreme Court set forth the sufficiency of the evidence test as follows:
An appellate court's function when reviewing the sufficiencyof the evidence to support a criminal conviction is to examinethe evidence admitted at trial and determine whether suchevidence, if believed, would convince the average mind of thedefendant's guilt beyond a reasonable doubt. The relevant inquiryis whether, after viewing the evidence in a light most favorableto the prosecution, any rational trier of fact could have foundthe essential elements of the crime proven beyond a reasonabledoubt.
 {¶ 13} In contrast, when reviewing whether a verdict is against the manifest weight of the evidence, the appellate court must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720-721.
 {¶ 14} Port was convicted of Carrying a Concealed Weapon in violation of R.C. 2923.12. Pursuant to R.C. 2923.12(A),
No person shall knowingly carry or have, concealed on theperson's person or concealed ready at hand, any of thefollowing:
 (1) A deadly weapon other than a handgun;
 (2) A handgun other than a dangerous ordnance;
 (3) A dangerous ordnance.
Furthermore, R.C. 2923.11(A) defines "deadly weapon":
"Deadly weapon" means any instrument, device, or thing capableof inflicting death, and designed or specially adapted for use asa weapon, or possessed, carried, or used as a weapon.
 Concealed Weapon {¶ 15} For purposes of R.C. 2923.12, the test for determining "concealment" is set forth in State v. Pettit (1969),20 Ohio App.2d 170, 173-74, 252 N.E.2d 325, as the following:
a weapon is concealed if it is so situated as not to bediscernable by ordinary observation by those near enough to seeit if it were not concealed, who would come into contact with thepossessor in the usual associations of life; but that absoluteinvisibility is not required, since ordinary observation does notextend to a search unusually careful, thorough or detailed, madebecause of suspicion that contraband which is not visible byordinary observation may in actuality be present.
Furthermore, the Ninth District Court of Appeals found that a weapon need not be totally hidden from observation in order to render it concealed within the meaning of the statute. State v.Brandle (1996), 116 Ohio App.3d 753, 689 N.E.2d 94, citingState v. Coker (1984), 15 Ohio App.3d 97, 472 N.E.2d 747. In conclusion, it is not necessary to prove that the weapon was carried in such a manner or in such a location as to give absolutely no notice of its presence under any observation; rather, it is sufficient to prove that ordinary observation would give no notice of its presence. Coker, 15 Ohio App.3d at 98.
 Deadly Weapon {¶ 16} In State v. Johnson (2003), 8th Dist. App. No. 81299, 2003-Ohio-4177, the court held that there was evidence to support a finding that the knife was a deadly weapon because the police testified that defendant had told them that he was carrying the knife for his own protection because he had been robbed. Therefore, there was sufficient evidence to provide that the defendant was carrying the knife for use as a weapon. Furthermore, in State v. Manning (February 16, 2001), 2nd Dist. App. No. 18347, the court held that a knife was a deadly weapon even though the blade was less than two inches in length, was concealed inside a cylinder, the defendant did not use the knife as a weapon, and the defendant testified that he had used the knife to cut wires and clean fish.
 {¶ 17} In this case, Officer Musser testified at the trial that:
A: Darrell opened up the car door, he started to get out,Major Caryer was on the passenger's side observing the passenger,and he yelled to me, "Knife, knife" two times.
* * *
Q: Now, what did you do when Major Caryer yelled "knife"?
 A: I took a couple steps towards the front of the car, Ilooked — I had my flashlight out, I looked in and I saw theknife. I held Darrell by his right arm. He was already stillgetting out of the car. I had escorted him out and we started towalk towards the back of the vehicle.
* * *
Q: Now, did anybody do anything with the knife?
 A: Yes. * * * Major Caryer walked around, secured the knife,and put it into my cruiser.
 Q: So Major Caryer's the one that actually recovered theknife?
 A: Yes.
 Q: Now, did you — after Major Caryer yelled "knife", did youobserve the knife yourself?
 A: Yes, I did. I had to take a different angle to see theknife, though.
 Q: And was that before Major Caryer had recovered it?
 A: Yes.
 Q: Can you tell the jury exactly where that knife waslocated?
 A: It was located on the driver's seat, on the right half ofthe seat.
* * *
Q: Where was the knife recovered in relation to where theDefendant had been seated?
 A: When I saw the knife it was probably mid thigh back on thedriver's seat, on the right half of the seat.
 Q: Was that observable before the Defendant got out of thevehicle?
 A: No, it wasn't.
 Q: Do you know if the knife was where he would have actuallybeen seated on top of it?
 A: That's where I assume it was. I had observed him the entiretime I was at the — I had the whole contact with him. And when hegot up there was no way that anybody could have put the knifeunderneath him because I would have seen that.
 Q: Now, when you had the Defendant get out of the vehicle didyou lose sight of him at any point between the time you told himto get out of the vehicle and he actually got out of thevehicle?
 A: No, I didn't.
* * *
Q: Now, this knife, can you — that you saw on the seat, yousaid at about mid thigh?
 A: Yes.
 Q: Can you describe that knife for us?
 A: It was a Winchester lock blade pocket knife, and it waslocked in the open position, the blade exposed.
 Q: So when you say "open position", you mean what?
 A: I mean the pocket knife was open ready for use.
* * *
Q: As an Officer are knives something you have particularconcern about?
 A: Yes.
 Q: And why's that?
 A: They are deadly.
 Q: And why do you say they're deadly?
 A: A knife blade can be used to cut, stab, slice. That'sdefinitely a safety concern.
 Q: And in your experience are they something that can, infact, cause death?
 A: Yes, they are.
 Q: Now, with respect to this knife, after you found it, didyou talk to the Defendant about this knife?
 A: Yes, I did. * * *
 Q: And what did he say?
 A: He said he had it for protection. That he was havingproblems with — with someone — I believe he said his name wasDavid Daniels.
 Q: So he had it for protection because he was having problemswith a David Daniels?
 A: Yes.
 Q: Did he admit that was his knife?
 A: Yes.
Aug. 30, 2005 Trial Trans. p. 277-292. In addition, Major Caryer testified at his deposition as follows:
A: * * * I know the Officer asked Mr. Port to step out of thecar, and as he leaned forward to start getting out of the car Isaw a fairly large lock blade knife underneath his left thigh.Told the Officer there was a knife there —
 Q: Let's back up a second. When you first approached the caryou said you saw the Defendant seated in the driver's seat?
 A: Yes.
 Q: Did you see the knife at that time?
 A: No.
 Q: Why not?
 A: It was underneath his leg.
 Q: And so he actually had to move his leg in order for you tobe able to see it?
 A: Correct.
 Q: You said it was a lock blade. Was it closed or open?
 A: It was an open lock blade.
* * *
Q: You said the knife was right under his right thigh. Couldyou explain for us exactly, you know, where the blade was;whether it was facing straight out towards the steering wheel or—
 A: The knife was with the point pointing towards the dash, thehandle pointing towards the back of the seat, and it was rightunderneath his right thigh laying right in line with his leg. Soif his leg's — the knees pointed towards the dash, the point ofthe knife was towards the dash.
 Q: Okay.
 A: And by the hip, the handle would have been towards thehip.
 Q: Okay. * * * Aug. 12, 2005 Depo. of Major Caryer p. 4-5, 17-18.
¶ 18 In sum, in reviewing the totality of the evidence, we cannot conclude that the trial court clearly lost its way or created a manifest miscarriage of justice. Furthermore, after viewing the entire record and the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of Carrying a Concealed Weapon were proven beyond a reasonable doubt. Accordingly, Port's first and second assignments of error are overruled.
 {¶ 19} Port alleges in his second assignment of error that his trial counsel failed to raise the affirmative defense to Carrying a Concealed Weapon and he failed to request jury instructions on his affirmative defense.
 {¶ 20} R.C. 2923.12(D) provides,
It is an affirmative defense to a charge under division (A)(1)of this section of carrying or having control of a weapon otherthan a handgun and other than a dangerous ordnance that the actorwas not otherwise prohibited by law from having the weapon andthat any of the following apply:
* * *
(2) The weapon was carried or kept ready at hand by the actorfor defensive purposes while the actor was engaged in a lawfulactivity and had reasonable cause to fear a criminal attack uponthe actor, a member of the actor's family, or the actor's home,such as would justify a prudent person in going armed.
* * *
(4) The weapon was being transported in a motor vehicle forany lawful purpose, was not on the actor's person, and, if theweapon was a firearm, was carried in compliance with theapplicable requirements of division (C) of section 2923.16 of theRevised Code.
 {¶ 21} In order to prevail on a claim of ineffective assistance of counsel, Port must establish both of the following:
1. Trial counsel made errors so serious he was no longerfunctioning as counsel in the manner guaranteed by the SixthAmendment; and
 2. There is the reasonable probability that were it not fortrial counsel's errors, the results of the trial would have beendifferent.
See Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373. Thus, under this standard, Port must show that his counsel's performance fell below an objective standard of reasonable representation and that prejudice arose from that deficient performance. Bradley, 42 Ohio St.3d at 142. Furthermore, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. Statev. Malone (Dec. 13, 1989), Montgomery App. No. 10564.
 {¶ 22} In this case, Officer Musser testified that during the stop Port stated the following with respect to the knife that was found in the vehicle:
A: He said he had it for protection. That he was havingproblems with — with someone — I believe he said his name wasDavid Daniels.
 Q: So he had it for protection because he was having problemswith a David Daniels?
 A: Yes.
 Q: Did he admit that was his knife?
 A: Yes.
 Q: Did he suggest that he had any other use for the knifeother than to have it for protection against David Daniels?
 A: At the time, no. * * *
Aug. 30, 2005 Trial Trans. p. 292. Furthermore, Major Caryer testified that Port said:
Daniels was assaultive and was causing some kind of problems.He actually said that Daniels was a bad ass. He had been in themarines and that he had assaulted somebody a few days beforethat.
Aug. 12, 2005 Depo. of Major Caryer p. 8.
 {¶ 23} Upon review, it is our conclusion that the claim of ineffective counsel regarding the failure to raise an affirmative defense or to request jury instructions on an affirmative defense is meritless. R.C. 2923.12(D) provides that it is an affirmative defense that the weapon was carried or kept ready at hand by the actor for defensive purposes while the actor was engaged in alawful activity and had reasonable cause to fear a criminalattack. There is nothing in the record to support a claim that Port had a legitimate reason to fear for his safety such as would justify a prudent person in being armed, or that counsel's decision not to pursue a presentation of an affirmative defense was not a sound strategic decision to prevent opening doors at trial that may not have been in the defendant's best interest. Furthermore, Port has not demonstrated that had his counsel raised this defense, the result of the proceeding would have been different. Therefore, Port's third assignment of error is overruled.
 {¶ 24} Accordingly, Port's assignments of error are overruled and the October 5, 2005 Judgment of conviction and sentence entered in the Court of Common Pleas, Marion County, Ohio is affirmed.
Judgment affirmed.
 Bryant, P.J., concurs.
 Rogers, J., concurs separately.