[Cite as *State v. Densmore*, 2009-Ohio-6870.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO.  7-08-04

    v.

DANA DENSMORE, JR.,                 O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Henry County Common Pleas Court
Trial Court No. 07 CR 0084

**Judgment Affirmed**

**Date of Decision:    December 28, 2009**

APPEARANCES:

    *Matthew O. Hutchinson*  for Appellant

    *John H. Hanna*  for Appellee

Case No. 7-08-04

**PRESTON, P.J.**

{¶1} Defendant-appellant, Dana Densmore Jr. (hereinafter "Densmore"), appeals the Henry County Court of Common Pleas judgment of conviction on one count of felonious assault. For the reasons that follow, we affirm.

{¶2} This matter stems from an altercation outside a bar in Liberty Center, Ohio in the early morning hours of December 9, 2007. It is undisputed that Densmore used a pocket knife on the victim, Ron Vicars[1] (hereinafter "Vicars"), and is responsible for his injury; however, at trial, Densmore relied on the claim of self-defense.

{¶3} On December 12, 2007, Densmore was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree. Densmore entered a plea of not guilty. A jury trial was held on June 10-11, 2008. At the conclusion of the trial, the jury found Densmore guilty of felonious assault. On July 23, 2008, Densmore was sentenced to a term of three years in prison and ordered to pay $629.52 in restitution to Vicars.

{¶4} Densmore now appeals and raises three assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE COURT ABUSED ITS DISCRETION BY FAILING TO INSTRUCT THE JURY AS TO THE INFERIOR DEGREE OFFENSE OF AGGRAVATED ASSAULT.**

---

[1] This Court notes that the victim's last name is spelled differently as between the parties' briefs; therefore, we elect to use the spelling used in the transcript: "Vicars."

-2-

{¶5} In his first assignment of error, Densmore argues that the trial court erred by not instructing the jury to the inferior degree offense of aggravated assault when there was sufficient evidence of serious provocation to warrant the additional instruction. In response, the State argues that there was no evidence of provocation nor was there evidence that Densmore was under a fit of rage or sudden passion. In addition, the State asserts that since the trial court instructed the jury on self-defense, an instruction on the inferior offense of aggravated assault would have been contradictory.

{¶6} First, we note that Densmore did not object to the instructions when they were given by the trial court. As a result "[t]he failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood* (1983), 3 Ohio St.3d 12, 444 N.E.2d 1332, at syllabus. Absent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal. Id. at 13, citing *State v. Humphries* (1977), 51 Ohio St.2d 95, 364 N.E.2d 1354.

{¶7} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. The Ohio Supreme Court, in *Barnes,* articulated a three-part test for finding plain error:

**First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.**

*Barnes*, 94 Ohio St.3d at 27 (internal citations omitted). Thus, "[o]nly extraordinary circumstances and the prevention of a miscarriage of justice warrant a finding of plain error." *State v. Brown,* 3d Dist. No. 8-02-09, 2002-Ohio-4755, ¶8, citing *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus.

{¶8} Densmore was charged with felonious assault, which is codified in R.C. 2903.11(A)(2) and provides, "[n]o person shall knowingly cause or attempt to cause physical harm to another or another's unborn by means of a deadly weapon or dangerous ordnance." Aggravated assault is an "inferior degree" offense to felonious assault, which means that the two offenses are similar except for the "additional mitigating element of serious provocation" in the aggravated assault offense. *State v. Deem* (1988), 40 Ohio St.3d 205, 210-11, 533 N.E.2d 294. That mitigating factor in the offense of aggravated assault requires proof that the defendant acted "under the influence of sudden passion or in a fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C.

2903.12(A)(2). Moreover, the defendant has the burden of proving the mitigating factor by a preponderance of the evidence. *State v. Nowden*, 2nd Dist. No. 07CA0120, 2008-Ohio-5383, ¶56, citing *Deem*, 40 Ohio St.3d at 210-11.

> **Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time.**

*Deem*, 40 Ohio St.3d 205, at paragraph five of the syllabus, quoting *State v. Mabry* (1982), 5 Ohio App.3d 13, 449 N.E.2d 16, paragraph five of the syllabus. As a result, in a case involving a felonious assault, if the defendant "presents sufficient evidence of serious provocation (such that a jury could both reasonably acquit defendant of felonious assault and convict defendant of aggravated assault), an instruction on aggravated assault (as a different degree of felonious assault) *must* be given." Id. at 211 (emphasis in original).

{¶9} At trial, the State called five witnesses that were present on the night of the altercation. The first witness the State called was Denise Wittenmeyer (hereinafter "Wittenmeyer"), the owner of the bar where the altercation took place. (June 10, 2008 Tr. at 27-28). She testified that she was working by herself on the night of the altercation. (Id. at 29). She stated that she had known Densmore for about five years and that she had seen Densmore there that night. (Id.). Even

though the two of them only engaged in small talk that evening, she said that she could tell Densmore was acting "different than usual," and not acting like himself. (Id.). Wittenmeyer testified that she witnessed Densmore talk to and poke one of the other patrons (Allan "Scott" Frankenberger) (hereinafter "Frankenberger") in the chest, which caused Frankenberger to become agitated, and as a result, she had to separate the two. (Id. at 30). When it came time to close, she said that she asked everyone to leave, but that Densmore refused to leave because he wanted to talk to her. (Id. at 31). So, another patron (Vicars), walked Densmore out with a few of the other patrons. (Id.). While Wittenmeyer acknowledged on cross-examination that Vicars had physically led Densmore out, she said that Vicars had just put his arm around Densmore's shoulder – that his actions were more polite, than aggressive. (Id. at 37). Then, Wittenmeyer said that after everyone went outside, Vicars ran back into the bar and told her to call 911 because he had been stabbed. (Id. at 32). She saw that Vicars had a cut approximately two inches long on his arm, and she called 911 and stayed on the phone until the paramedics and sheriff's department arrived. (Id. at 33). Wittenmeyer testified that she did not think there had been any issues between Vicars and Densmore that night. (Id. at 31).

{¶10} Next, the State called the three other people who had been there that night with Vicars: Sarah Vicars (the victim's wife) (hereinafter "Vicar's wife"),

Frankenberger, and his girlfriend Beth Blaze (hereinafter "Blaze"). (Id. at 38). They all testified that on the night of the altercation, they were sitting at a booth in the bar talking, when Densmore (whom none of them had ever met before) unexpectedly sat down with them. (Id. at 39, 74-74, 91-92). They stated that Densmore never said anything to them while he was sitting at their booth, but rather just sat there and stared at everybody before getting up and leaving soon afterwards. (Id. at 39, 75). When it came time for the bar to close, Vicar's wife stayed in the bar with Wittenmeyer because, at some point when the bar was closing, her husband had told her to stay inside because he thought there was "going to be an altercation." (Id. at 44-45). The next thing she remembered was her husband running back inside the bar, asking someone to call 911 because he had been stabbed. (Id. at 41).

{¶11} Frankenberger testified that after Densmore left their booth, he never saw him again until the bar was closing, at which time, Densmore "approached [him], kind of got in [his] face not knowing who [he] was, started poking [him] in [his] chest," and Wittenmeyer subsequently intervened. (Id. at 77). Then at that point, Frankenberger stated that Vicars tried to get Densmore to leave the bar and "grabbed him by the arm of the coat and just kind of, we pulled him outside." (Id. at 78). When they (Blaze, Vicars, Densmore, and himself) were outside, they started smoking, but Densmore kept trying to talk to Frankenberger, and Vicars

was trying to get Densmore to leave. (Id. at 78). After they were done smoking, Blaze and Frankenberger walked out to their car, and when Frankenberger turned back around, he saw Vicars and Densmore on the ground. (Id. at 79). Frankenberger testified that when he ran over to them, Vicars had Densmore pinned down and asked Frankenberger to get "the knife." (Id. at 79). However, Frankenberger said he was unable to get the knife away from Densmore, so he asked Vicars if he wanted him to break Densmore's legs so that he would not be able to get up and follow them, but Vicars told him no. (Id.). Instead, Frankenberger said that they counted to three and both took off in opposite directions – Frankenberger ran to his car and drove off with his girlfriend, while Vicars ran back inside the bar. (Id. at 80). Frankenberger testified that while Vicars had seemed aggravated with Densmore when he was trying to get him to leave the bar, Frankenberger said that he never saw Vicars make any aggressive gestures towards Densmore that night. (Id. at 81).

{¶12} In addition, Blaze testified that when the bar was closing, she saw Densmore trying to talk to Frankenberger and that he had wanted to know what Frankenberger's problem was with him. (Id.). She said that Vicars escorted Densmore out of the bar, and when the four were outside the bar, she said they tried to get Densmore to leave, but he still was trying to talk to Frankenberger. (Id. at 94). Blaze testified that eventually she got Frankenberger to leave with her,

and when they got to their car, they saw Vicars and Densmore on the ground. (Id. at 95). She testified that Frankenberger went over to assist, and she saw all three of them struggle until she heard one of them count to three, at which time, Vicars ran into the bar and Frankenberger ran back to the car. (Id. at 95-96). When he got into the car and they were driving away, Densmore started chasing them down the street and yelled something unintelligible at them. (Id. at 96).

{¶13} The last witness called for the State was the victim, Vicars. (Id. at 100). Vicars testified that he had never met Densmore before that night when Densmore pulled up a chair to his group's booth. (Id. at 101). At the end of the night, Vicars noticed Densmore was trying to talk to Wittenmeyer, but that she was trying to get him to leave, so Vicars said he walked Densmore outside. (Id. at 102). When they all got outside, Vicars said Densmore and Frankenberger were arguing with one another, but that he eventually got the two of them to separate and walk to their respective cars. (Id. at 102). As Frankenberger was walking away, Vicars testified that the following occurred:

> **Vicars: * * * Dana Densmore had said, you know, we'll just let Jesus straighten it out, okay, and then I had said, you know, it's 2:30 in the morning, the police will be coming by, wake up in our own beds, Scott agreed, was going back to his car, and Dana had positioned himself to my left and had said something to me that he was the rapture, and not really sure of what all was said, just after that I know I was pushed, I pushed back, when he come back at me, I swung and hit him, he went back a number of steps, come back at me again, I swung and hit him again, and then the third time that he come at me I didn't swing, I just**

**tackled him and got him on the ground because I thought I was going to hurt him, because he just kept coming back, not, at that point was not aware that I had been cut or stabbed or anything until, when I had him on the ground, and I don't know how I was positioned on him but somehow or another I was on him and holding his arm and like this, the knife blade stuck out and my hand was there, and that's when I called for Scott to come back to try to get the knife out of his hands or out of his hand and, you know, he tried to grab a hold of it but couldn't and I told Scott to go back to his car and from there, you know, I jumped up and got back into the bar.**

(Id. at 103-04). Besides Densmore sitting down at their booth that night, Vicars testified that there were no other interactions between the two of them that night. (Id. at 108). On cross-examination, Vicars admitted to having one or two drinks that night and that he had pushed Densmore towards his car after Densmore had pushed him. (Id. at 110, 115). In addition, Vicars said that Densmore appeared more agitated than a normal person, but that he could not say for sure whether Densmore had been highly intoxicated. (Id. at 120).

{¶14} Densmore's version of the events leading up to the altercation was slightly different. He stated that at the bar that night he had walked around talking to Wittenmeyer and other people. (Id. at 127). When it came time for the bar to close, he said that he did not feel like leaving and asked Wittenmeyer if he could stay and talk to her for a few minutes. (Id. at 128). That was when he stated that Vicars came up behind him and grabbed his arm "pretty good" and escorted him outside. (Id.). When he got outside, he said that everyone else except

Wittenmeyer was outside, and they were all smoking. (Id.). So, he asked someone for a cigarette and stayed out there with everyone and had a "general conversation." (Id.) Then, Densmore said one of the couples started to leave, and that was when Vicars started pushing him towards his truck. (Id.). Densmore said that he turned around and told Vicars to stop pushing him and to leave him alone, but that was when Vicars hit him in the face and he went down. (Id.). Densmore testified that when he went down, Vicars got on top of him and "kept punching, I was getting to the point where I couldn't breath, getting to where I couldn't see very well because getting hit in the face, so, you know, I was getting pretty close to passing out from not being able to breath." (Id. at 128-129). That was when he took out his pocket knife, used his leg to open it, and cut Vicars to get his arm off of his neck. (Id. at 129). Vicars then told him that he was going to call the police, at which point, Densmore said that he stayed outside and waited for the police to arrive. (Id. at 130). Densmore testified that he usually keeps a pocket knife on him, but that he typically uses it as a tool, such as for cutting rope and wire, and to clean his nails. (Id.). Densmore stated that he felt that he had tried to do everything possible to get Vicars off of him, but believed that using his pocket knife was the only way to get Vicars to stop choking him. (Id.).

{¶15} On cross-examination, Densmore admitted that he had kept refusing to leave the bar when Wittenmeyer was trying to close, and that he was eventually

escorted outside. (Id. at 136). However, Densmore could not recall poking Frankenberger in the chest and arguing with him that night inside the bar, but he did recall arguing with him outside. (Id. at 137). Densmore could also not recall whether Frankenberger or Blaze came back to help, but Densmore did admit to chasing a vehicle down the street after the altercation because he said that he did not know whether they were going to come back after him. (Id. at 141). Densmore denied saying anything about being the rapture to Vicars. (Id. at 144). In addition, Densmore admitted to taking anti-depressants and he said that when he went to the bar he had told Wittenmeyer that he had not taken his medication, so that he could have a good time that night. (Id. at 144-45). He also testified that he had had a few drinks, and that he was pretty close to being drunk. (Id. at 145).

{¶16} Based on the record, we believe the evidence was insufficient to warrant a jury instruction on aggravated assault because there was insufficient evidence of serious provocation. There is no evidence that Vicars provoked Densmore into a fit of rage or sudden passion. Even if we were to believe Densmore's version of the events that Vicars hit him first, Densmore's testimony fails to demonstrate that he was in a state of rage or sudden passion when he stabbed Vicars; in fact, it demonstrates the opposite, which was that Densmore rationally stabbed Vicars.

{¶17} Densmore's testimony was that after Vicars knocked him to the ground, he stabbed him to try to get Vicars off of him. Densmore emphasized that he had tried to do everything possible to get Vicars off of him, but that using his pocket knife was the only way to get Vicars to stop choking him. When explaining how he stabbed Vicars, Densmore stated,

> **I had reached around, because I couldn't get this arm free to do anything, reached around in my pocket, pulled my pocket knife out that I carry, well, I carried that particular for at least 10 years, and I proceeded to open the blade with my thumb and then I used my leg to open it the rest of the way, reached up, cut him to get his arm off of me so I could start breathing again, and within seconds after that he got up and went one way and I went the other way.**

(June 10, 2008 Tr. at 129). Densmore even physically demonstrated his actions during the altercation and gave the court a reasonable and rational play-by-play account of the incident. (Id. at 133-35). All of this evidence illustrates that Densmore's actions were calculated, and not in a state of rage.

{¶18} Moreover, we note that the trial court instructed the jury on self-defense, which is a "complete defense to all substantive elements of the crime charged' (or, consequently, to any lesser included offense)." *State v. Rick*, 3d Dist. No. 9-08-27, 2009-Ohio-785, ¶64, citing *State v. Shadd* (June 14, 1994), 3d Dist. No. 9-94-5, quoting *State v. Nolton* (1969), 19 Ohio St.2d 133, 135, 249 N.E.2d 797. This Court has stated that a defendant who asserts self-defense "is not entitled under Ohio law to instructions on self-defense and on lesser included

offenses, but must choose between the two."  Id., quoting *Shadd*, 3d  Dist. No. 9-94-5, citing *Nolton*, 19 Ohio St.2d at 135.  See, also, *State v. Briggs*, 3d Dist. No. 1-06-27, 2006-Ohio-5144, ¶11;[2] *State v. Gutierrez* (Sept. 21, 1995), 3d Dist. No. 5-95-10, at *4.  Throughout the entire trial, Densmore asserted this affirmative defense.  Densmore's defense attorney even stated during his closing arguments:

> **So I believe, ladies and gentlemen of the jury, he definitely proved to you the area of self defense.  He was not at fault in creating the situation that gave rise to the event of his injury as I explained before and the position that he was on his back, somebody on him, sitting on him, getting ready or choke or choking him, he had no position in his mind and reasonable grounds to believe even if it was… (INAUDIBLE)…that that's what he needed to do to get out of the situation that he was there.**

(June 11, 2008 Tr. at 18).  Accordingly, we cannot conclude that the trial court erred in failing to instruct the jury on aggravated assault because there was insufficient evidence to warrant the instruction and the trial court instructed on self-defense.

{¶19} Densmore's first assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. II

**THE COURT COMMITTED PLAIN ERROR IN FAILING TO INSTRUCT THE JURY AS TO "DEADLY FORCE" AND SELF-DEFENSE AGAINST DANGER OF BODILY HARM.**

---

[2] In *State v. Saldana*, 3d Dist. No. 16-08-09, 2008-Ohio-5829, ¶10 fn.1, this Court recognized that even though we had misstated the Ohio Supreme Court's language in *Deem* (calling aggravated assault a lesser included offense rather than an inferior offense of felonious assault), we found that its holding was applied properly.

{¶20} In his second assignment of error, Densmore argues that the trial court improperly instructed the jury because it failed to define "deadly force" and failed to give the jury the non-deadly force self-defense instructions.

{¶21} As Densmore admits in his brief, he did not object to the instructions when they were given by the trial court. As a result "[t]he failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." *Underwood*, 3 Ohio St.3d 12, at syllabus. Absent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal. *Underwood*, 3 Ohio St.3d at 13, citing *Humphries*, 51 Ohio St.2d 95.

{¶22} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *Barnes*, 94 Ohio St.3d at 27. The Ohio Supreme Court, in *Barnes,* articulated a three part test for the finding of plain error.

> **First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.**

*Barnes*, 94 Ohio St.3d at 27 (internal citations omitted). Thus, "[o]nly extraordinary circumstances and the prevention of a miscarriage of justice warrant a finding of plain error." *Brown,* 2002-Ohio-4755, ¶8, citing *Long*, 53 Ohio St.2d 91, at paragraph three of the syllabus.

**{¶23}** Generally, a trial court has broad discretion to decide how to fashion jury instructions. The trial court must not, however, fail to "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen* (1990), 50 Ohio St.3d 206, 553 N.E.2d 640, paragraph two of the syllabus.

**{¶24}** Self-defense is an affirmative defense, which means that the burden of going forward is on the defendant who must prove each element by a preponderance of the evidence. R.C. 2901.05; *Struthers v. Williams*, 7th Dist. No. 07 MA 55, 2008-Ohio-6637, ¶12, citing *State v. Jackson* (1986), 22 Ohio St.3d 281, 283, 490 N.E.2d 893. In asserting the affirmative defense of self-defense, the defendant cannot simply deny or contradict the evidence that has been presented by the State; rather, he must admit the prohibited conduct but assert surrounding facts and circumstances that justified engaging in the prohibited conduct. *Struthers*, 2008-Ohio-6637, ¶12, citing *State v. Grubb* (1996), 111 Ohio App.3d 227, 282, 675 N.E.2d 1353.

**{¶25}** There are essentially two different forms of self-defense in Ohio: (1) self-defense against danger of bodily harm ("non-deadly force" self-defense); and (2) self-defense against danger of death or great bodily harm ("deadly force" self-defense). The elements of self-defense that a defendant must prove differ depending on the level of force used. *Struthers*, 2008-Ohio-6637, at ¶13. The main difference between the two instructions is that the deadly force self-defense instruction is a more rigid standard than the non-deadly force self-defense instruction.

**{¶26}** The deadly force self-defense instruction requires the defendant to prove by a preponderance of the evidence that: (1) he perceived himself to be in grave danger; and (2) he did not have a duty to retreat, under the circumstances. *State v. Hansen* (May 7, 2002), 4th Dist. No. 01CA15, at *2, citing *State v. Robbins* (1979), 58 Ohio St.2d 74, 388 N.E.2d 755. In contrast, the non-deadly force self-defense instruction only requires the defendant to show that he *reasonably believed* that such conduct was necessary to defend himself; moreover, there is generally no duty to retreat in non-deadly force circumstances. Id. at *3, citing *Columbus v. Dawson* (1986), 33 Ohio App.3d 141, 514 N.E.2d 908.

**{¶27}** Densmore argues that the outcome of the case would have been different had the trial court defined "deadly force" and instructed them as to non-deadly force self-defense. He asserts that had it been given the definition and

-17-

instruction, the jury would have determined that his conduct did not amount to deadly force. Specifically, Densmore points to the following in support of his claim: (1) he had used a small pocket knife, (2) the injury only required stitches, (3) there was no evidence that the cut to Vicar's arm posed a substantial risk of death, (4) his small pocket knife could not have caused a very serious injury since Vicars was wearing a heavy winter coat, and (5) Vicars had Densmore restrained so that he could not have caused any other injuries to Vicars. Overall, Densmore argues that while his actions may have caused a substantial risk of physical harm, his actions did not rise to the level of causing substantial risk of death.

{¶28} We find Densmore's arguments unpersuasive. Just because a defendant does not actually cause serious injury to the victim, does not mean that his actions did not amount to deadly force. See *Hansen*, 4th Dist. No. 01CA15, at *4 (finding slashing another person with a lock-blade knife carries a substantial risk of death warranting the deadly force self-defense instructions, even though the injury caused by defendant was not serious); *State v. Wagner* (July 14, 2000), 11th Dist. No. 99-L-043, at *3 (rejecting defendant's argument that using a broken wineglass was not deadly force because it did not seriously injure the victim); *State v. Chlebowski* (May 28, 1992), 8th Dist. No. 60808, at *4 (rejecting defendant's argument that the instructions should have been tailored to the facts of the instant case, which involved a charge of merely causing physical harm,

because defendant had used a deadly weapon in inflicting physical harm). Deadly force is defined as "any force that carries a substantial risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2). Clearly, using a knife on someone's person that can easily cut through an overcoat and clothing carries a substantial risk of death. Moreover, other courts have also found that the use of a small knife on another person's body constituted deadly force, rather than non-deadly force. *Struthers v. Williams*, 7th Dist. No. 07 MA 55, 2008-Ohio-6637, ¶13 (stating that a defendant's act of killing a victim by stabbing him with a knife was deemed "deadly force" by the Ohio Supreme Court); *State v. Skinner*, 9th Dist. No. 06CA009023, 2007-Ohio-5601, ¶19; *State v. Sims*, 8th Dist. No. 85608, 2005-Ohio-5846, ¶17; *Hansen,* 4th Dist. No. 01CA15, at *4 (finding that using a lock blade knife warrants an instruction on the use of deadly force).

{¶29} Furthermore, this Court notes that the parties appeared to have conceded that Densmore's actions amounted to deadly force. For example, the defense counsel in his closing arguments stated that the evidence illustrated that Densmore had honest belief "that he was in imminent danger of death or great bodily harm, and that is [sic] only reasonable means of withdraw from such danger was by the use of deadly force." (June 11, 2008 Tr. at 16).

{¶30} Therefore, we find that the trial court's failure to instruct the jury as to the definition of deadly force and non-deadly force self defense did not rise to plain error since it is clear that Densmore's actions amounted to deadly force.

{¶31} Densmore's second assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. III**

**MR. DENSMORE WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE: COUNSEL DID NOT REQUEST THE COURT TO INSTRUCT THE JURY AS TO AGGRAVATED ASSAULT, DEADLY FORCE, AND NON-DEADLY FORCE SELF-DEFENSE; COUNSEL DID NOT OBJECT TO QUESTIONS ABOUT POST-ARREST SILENCE.**

{¶32} In his third assignment of error, Densmore argues that he was denied effective assistance of counsel because his trial counsel failed to object to the lack of a jury instruction on aggravated assault and deadly force and non-deadly force self-defense, and failed to object to the evidence of Densmore's post-arrest silence.

{¶33} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole* (2001), 92 Ohio St.3d 303, 306, 750 N.E.2d 148, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show counsel's conduct was deficient or unreasonable, the defendant must

overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie* (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 141-42, 538 N.E.2d 373, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623, vacated on other grounds in *Lytle v. Ohio* (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.

**{¶34}** First, Densmore argues that his attorney was ineffective because he failed to object to the lack of jury instructions as to aggravated assault, deadly force, and non-deadly force self-defense. Densmore claims that had the attorney requested such instructions, the result would have been different. However, this Court has already determined that Densmore was not entitled to the instruction on aggravated assault because there was no evidence of serious provocation. See *State v. Crawford*, 8th Dist. No. 22314, 2008-Ohio-4008, ¶¶26-30 (finding that there was no ineffective assistance when defendant's attorney failed to request

aggravated assault charge when defendant was asserting self-defense claim.) Moreover, this Court has found that the jury instruction as to deadly force self-defense was proper. See *Hansen*, 4th Dist. No. 01CA15, at *5 (declining to address defendant's ineffective assistance assignment of error since the court had found the jury instruction as to deadly force self-defense was proper). Therefore, we see no need to fully address these arguments since it could not have been ineffective assistance of counsel where the defendant was not entitled to any of the jury instructions. See id., citing *James A. Keller, Inc. v. Flaherty* (1991), 74 Ohio App.3d 788, 600 N.E.2d 736, citing *South Pacific Terminal Co. v. Interstate Commerce Comm.* (1910), 219 U.S. 498, 514, 31 S.Ct. 279, 55 L.Ed. 310.

**{¶35}** Second, Densmore argues that his attorney was ineffective because he did not object to the introduction of evidence of his post-arrest silence. Densmore relies on the rule that states the government cannot use a defendant's post-arrest, post-*Miranda* silence as a means to impeach him if he later decides to testify. *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. Specifically, Densmore states that the following testimony of the three law enforcement officers involved in the case should have been objected to by his attorney:

> **Deputy Walker: "I learned that Detective Sergeant Schultheis had attempted an interview with the Defendant, however he refused to make any statements or provide any information[.]"** (June 10, 2008 Tr. at 51).

**Deputy Cohrs: "I also went to the hospital where I met Detective Schultheis, we had entered the room, Detective Schultheis read him his Miranda Rights and asked him some questions but he decided to exercise his rights and not answer."** (June 10, 2008 Tr. at 62).

**Detective Schultheis: "Mr. Densmore was asked when I came in that I conduct an interview in reference to the stabbing, his answer was yes, and then I read him his Miranda Rights and he invoked those rights and decided not to answer any questions until an attorney was present."** (June 10, 2008 Tr. at 68).

**{¶36}** We do not believe that Densmore's trial counsel was constitutionally deficient in this case. His trial strategy appeared to be to show that Densmore never spoke to any of the law enforcement officers, even before his Miranda rights were given. (June 10, 2008 Tr. at 63-64). Densmore's trial counsel even raised the issue at trial during Densmore's testimony. (June 10, 2008 Tr. at 146). It is not our place to second-guess counsel's trial strategy, and his representation in this case was within an acceptable range of reasonable representation. *State v. Eason*, 7th Dist. No. 02 BE 41, 2003-Ohio-6279, ¶133.

**{¶37}** Densmore's third assignment of error is, therefore, overruled.

**{¶38}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, J., concur.**

**/jlr**

**ROGERS, J., concurring separately.**

{¶39} I concur with the result reached by the majority based on the circumstances of this case. However, I believe that it is error for a trial court to fail to provide the jury with the definition of "deadly force" whenever the deadly force self-defense instruction[3] is given. I simply do not find it to be plain error in this case.

{¶40} Appellant was charged with felonious assault, to wit: "* * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon." R.C. 2903.11(A)(2). Because the State must prove that the offender acted by means of a deadly weapon, it goes without saying that the trial court must include in the instructions a definition of "deadly weapon."

{¶41} Although a knife was used in Appellant's case, a knife is not, per se, a deadly weapon. A deadly weapon is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). This is a two-part definition: first requiring that the instrument have the capability of inflicting death; and second, having been designed, adapted, possessed, carried, or used as a weapon.

---

[3] Ohio Jury Instructions has captioned this defense as: Self-defense against danger of death or great bodily harm. OJI-CR 421.19.

> **The general rule is that a folding knife is not a deadly weapon, unless and until some extrinsic fact or circumstance distinguishes it from the norm.** *Columbus v. Dawson* **(1986), 28 Ohio App.3d 45, 46, 501 N.E.2d 677 (a knife is not presumed to be a deadly weapon, even if it is concealed);** *State v. Cathel* **(1988), 127 Ohio App.3d 408, 412, 713 N.E.2d 52 (a knife is not considered "in and of itself" to be a deadly weapon under the statute);** *State v. Anderson* **(1981), 2 Ohio App.3d 71, 72, 440 N.E.2d 814 (when an instrument is readily identifiable as one capable of inflicting death, such as a knife, proof of either additional element [designed/possessed, carried or used as a weapon] is nonetheless essential to sustain a conviction for carrying a concealed weapon).**

*State v. Port*, 3d Dist. No. 9-05-39, 2006-Ohio-2783, ¶30. (Rogers, J., concurring separately).

{¶42} If the jury concludes that the elements of the offense have been proven beyond a reasonable doubt, it may then consider an affirmative defense of self-defense. Here, the trial court gave the jury an instruction on self-defense that included the term "deadly force":

> **To establish a claim of self defense, the Defendant must prove by the greater weight of the evidence that, A, he was not at fault in creating the situation giving rise to the event in which injury occurred, and B, he had reasonable grounds to believe, and an honest belief, even if mistaken, that he was in imminent danger of death or great bodily harm and that his only reasonable means of withdrawal from such danger was by the use of** *deadly force***, and C, he had not violated any duty to withdraw to avoid the danger.**

(Emphasis added.) (Trial Tr., Vol. II, p. 43). The term "deadly force" is defined by statute as follows: "'Deadly force' means any force that carries a substantial

-25-

risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2). When a term used in a jury instruction is defined by statute, I feel strongly that the statutory definition should be given to the jury. This is necessary to insure that no inappropriate and prejudicial connotation is given to the term during the jury's deliberations.

{¶43} In considering the affirmative defense of self-defense in this case, the jury was required to consider whether the alleged deadly weapon was used in a manner that carried a substantial risk that it could proximately result in the death of the victim. Reflection over this point should cause the jury to ponder whether the knife was used in a manner which, in fact, created a substantial risk of causing death, whether intentionally or not. It is not enough that the knife is determined to be a deadly weapon, to wit: the knife was capable of causing death, and the knife was used as a weapon. Rather, the question is whether, in this case, the "deadly weapon" was used in a manner which created a substantial risk of death. If, as Appellant has argued, the victim was wearing a heavy winter coat which was unlikely to be penetrated by the relatively short blade of Appellant's knife, the jury could have concluded that the element of deadly force was not present. The majority, and the three cases relied upon by the majority, seem to reach the factual conclusion that any knife (or slashing with a broken bottle) constitutes deadly force. However, factual conclusions should be left to the jury.

**{¶44}** Furthermore, jumping to the conclusion that every use of even a small knife on another person's body is deadly force ignores the requirement that the use of the weapon creates "a substantial risk that it will proximately result in the death" of the victim. R.C. 2901.01(A)(2). "Substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur * * *." R.C. 2901.01(A)(8). To emphasize how strong that possibility must be in criminal law, Ohio Jury Instructions (OJI) has added the term "even" in front of "significant", so that the instruction currently in use by OJI and recommended to Ohio judges reads: "'Substantial risk' means a strong possibility, as contrasted with a remote or even a significant possibility, that a certain result may occur * * *." OJI-CR 503.11(A). Therefore, just because a small knife could possibly cause death does not justify a reviewing court jumping to the conclusion that its use always constitutes deadly force as defined by statute. There remains a significant factual issue, best to be determined by a jury, as to whether, in the case under consideration, there was a substantial risk of death.

**{¶45}** I would have preferred that each of these questions been answered by the jury in Appellant's case. However, there was no objection at trial to the limited instructions given by the trial court. Therefore, we must determine whether the error was plain error. Based on the facts related in this case, I cannot

Case No. 7-08-04

say that the jury clearly lost its way and that, but for this error, the verdict would

probably have been different.

**/jlr**