[Cite as *State v. Bagley*, 2014-Ohio-1787.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO.  1-13-31

    v.

BRUCE A. BAGLEY,                O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR20130033

**Judgment Affirmed**

**Date of Decision:   April 28, 2014**

APPEARANCES:

    *F. Stephen Chamberlain* **for Appellant**

    *Jana E. Emerick*  **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Bruce A. Bagley ("Bagley"), appeals the Allen County Court of Common Pleas' judgment entry of sentence. We affirm.

{¶2} This case stems from a June 27, 2012 altercation that took place near the intersection of Kibby Street and Harrison Avenue in Lima, Ohio. Nicole Schneider ("Schneider") and her half-brother, Elwood Fletcher ("Fletcher"), were traveling in Schneider's car and stopped at a traffic light when they encountered Bagley standing near the intersection. Arguments ensued, first between Schneider and Bagley, then between Fletcher and Bagley. Ultimately, Bagley cut Fletcher's throat with a knife, claiming self-defense.

{¶3} On February 14, 2013, the Allen County Grand Jury indicted Bagley on one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree. (Doc. No. 1). The indictment also contained specifications that: (1) Bagley had previously been convicted of a first or second-degree felony offense; and, (2) Bagley was a repeat violent offender ("RVO") under R.C. 2929.01(CC), and the offense indicted was an offense of violence and involved an attempt or threat to cause serious physical harm to a person or caused serious physical harm to a person. (*Id.*).

{¶4} On February 25, 2013, Bagley pled not guilty to the indictment at arraignment. (*See* Doc. No. 74).

{¶5} On June 4-5 and 13, 2013, a jury trial was held. (*See* Doc. No. 74). The jury found Bagley guilty of felonious assault and further found that Bagley failed to prove by a preponderance of the evidence that he acted in self-defense. (Doc. No. 72). The jury also found that the offense involved an attempt or threat to cause serious physical harm to a person or caused serious physical harm to a person. (*Id.*).

{¶6} On June 13, 2013, the trial court filed its judgment entry of conviction. (Doc. No. 74). The trial court scheduled an RVO-specification hearing and sentencing hearing for June 25, 2013. (*Id.*).

{¶7} On June 25, 2013, the trial court held an RVO-specification hearing and determined that Bagley was an RVO. (Doc. No. 78). The trial court proceeded to sentence Bagley to eight years imprisonment on the felonious-assault conviction and five years of additional imprisonment for his RVO designation, to be served consecutively, for an aggregate sentence of 13 years. (Doc. No. 79). The trial court also ordered that Bagley serve the term in this case consecutive to the term imposed in Case No. CR2012 0449. (*Id.*).

{¶8} On July 3, 2013, Bagley filed a notice of appeal. (Doc. No. 84). Bagley raises five assignments of error on appeal. To facilitate our analysis, we first address his third assignment of error, followed by his fourth and fifth assignments of error, then his first and second assignments of error together.

**Assignment of Error No. III**

**Defendant Bagley's convictions for felonious assault and a repeat violent offender specification were against the manifest weight of the evidence and not supported by sufficient evidence.**

{¶9} In his third assignment of error, Bagley argues that the jury's verdict finding him guilty of felonious assault was against the manifest weight of the evidence and based on insufficient evidence. Specifically, Bagley argues that "the jury lost its was [sic] in evaluating the evidence for self defense." (Appellant's Brief at 15). Bagley argues that Fletcher "inserted himself into the verbal confrontation" between Bagley and Schneider and then threatened and attacked Bagley, so Bagley's use of *non*-deadly force was warranted self-defense. (*Id.* at 16-17).

{¶10} At trial, Bagley did not dispute that the State could prove the elements of felonious assault. Rather, he asserted the affirmative defense of self-defense, and he argues on appeal that his felonious-assault conviction was against the manifest weight of the evidence and unsupported by sufficient evidence because his affirmative defense of self-defense was "completely sustained." (Appellant's Brief at 17). Bagley's challenge to the sufficiency of the evidence as to self-defense is inappropriate. *State v. Vasquez*, 10th Dist. Franklin No. 13AP-366, 2014-Ohio-224, ¶ 52.

{¶11} Self-defense is an affirmative defense, and the accused bears the burden of proving it by a preponderance of the evidence. *State v. Belanger*, 190 Ohio App.3d 377, 2010-Ohio-5407, ¶ 4 (3d Dist.). *See also* R.C. 2901.05(A). "The 'due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime.'" *Vasquez* at ¶ 52, quoting *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 37. Therefore, we address Bagley's self-defense arguments only in our analysis of the manifest weight of the evidence. *Id.*

{¶12} Nor will we address Bagley's arguments that his RVO "conviction" was against the manifest weight of the evidence and not supported by sufficient evidence. Although Bagley makes this assertion in the title of his third assignment of error, his argument under that assignment of error focuses solely on his purported self-defense as it relates to his felonious-assault conviction. He does not mention the RVO specification. Therefore, under App.R. 12(A)(2), we disregard Bagley's assertion that his RVO "conviction" was against the manifest weight of the evidence and not supported by sufficient evidence. *State v. Moyar*, 3d Dist. Auglaize No. 2-06-10, 2006-Ohio-5974, ¶ 9 ("We may disregard any assignment of error if the appellant 'fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief,

as required under App.R. 16(A).'"), quoting *State v. Chilcutt*, 3d Dist. Crawford Nos. 3-03-16 and 3-03-17, 2003-Ohio-6705, ¶ 8.

**{¶13}** In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶14}** Bagley was convicted of felonious assault in violation of R.C. 2903.11(A)(2); however, he does not dispute that the State proved the elements of that offense. Rather, Bagley argues that the jury lost its way in concluding that he

did not act in self-defense. Bagley argues that the evidence at trial demonstrated that he used non-deadly force on Fletcher in self-defense.

{¶15} The elements of self-defense differ depending on whether the defendant used deadly or non-deadly force to defend himself. *State v. Densmore*, 3d Dist. Henry No. 7-08-04, 2009-Ohio-6870, ¶ 25. Deadly force is "'any force that carries a substantial risk that it will proximately result in the death of any person.'" *Id.* at ¶ 28, quoting R.C. 2901.01(A)(2). Courts have concluded that using even "a small knife on another person's body" constitutes "deadly force." *Id.*, citing *Struthers v. Williams*, 7th Dist. Mahoning No. 07 MA 55, 2008-Ohio-6637, ¶ 13, *State v. Skinner*, 9th Dist. Lorain No. 06CA009023, 2007-Ohio-5601, ¶ 19, *State v. Sims*, 8th Dist. Cuyahoga No. 85608, 2005-Ohio-5846, ¶ 17, and *State v. Hansen*, 4th Dist. Athens No. 01CA15, 2002-Ohio-6135, ¶ 29. *See also State v. Harding*, 2d Dist. Montgomery No. 24062, 2011-Ohio-2823, ¶ 15 ("Stabbing a victim (or victims) with a knife constitutes the use of deadly force. * * * Consequently, to satisfy his burden, Harding had to meet the standard for self-defense through the use of deadly force."), citing *Sims* at ¶ 17, *Densmore* at ¶ 28, and *Hansen* ¶ 29. Here, Bagley does not dispute that he used a folding Tac Force knife to cut Fletcher's throat. (*See* Appellant's Brief at 7, 16-17); (June 4-5 and 13, 2013 Tr., Vol. Two, at 232-233). Therefore, contrary to his assertion, we

conclude that Bagley used deadly force, and he was required to satisfy the elements of self-defense by deadly force.

{¶16} To establish self-defense through the use of deadly force, an accused must prove: "(1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force; and (3) the accused must not have violated any duty to retreat or to avoid the danger." *State v. Thacker*, 3d Dist. Marion No. 9-03-37, 2004-Ohio-1047, ¶ 14, citing *State v. Williford*, 49 Ohio St.3d 247, 249 (1990) and *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. Because the elements of self-defense are cumulative, if the defendant fails to prove any one of these elements by a preponderance of the evidence, he has failed to demonstrate that he acted in self-defense. *Thacker* at ¶ 14, citing *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).

{¶17} At trial, the State called Schneider, who testified that Fletcher's and her half-sister, Angie, was in an ongoing controversy with Bagley concerning a cell phone, a cell-phone charger, and ten dollars, and that is how Schneider knew of Bagley. (June 4-5 and 13, 2013 Tr., Vol. One, at 87). According to Schneider, Bagley had given Angie a black eye. (*Id.* at 94-95). Schneider testified that,

according to her mother, on June 27, 2012, Bagley "ran up on" her mother's car, which was occupied by Schneider's children. (*Id.* at 93-94, 97, 112).

**{¶18}** That same day, Schneider, with Fletcher in the passenger seat, was stopped at a traffic light at the intersection of Harrison Avenue and Kibby Street, near Bagley's house, and she noticed Bagley was walking toward her car and talking on a cell phone. (*Id.* at 95-96). According to Schneider, she thought Bagley was talking to her, so she talked back to him. (*Id.* at 96). She testified that Bagley approached her car "hollering 'bitch' this and 'bitch' that," and she responded by saying, "What? I'm not scared," at which point the situation "proceeded into an argument." (*Id.* at 96-97).

**{¶19}** Schneider testified that she told Bagley "to just drop" the cell-phone controversy and that "he shouldn't be running up on people's cars with other people's kids in it." (*Id.* at 97). Bagley responded by saying that the cell phone Schneider's half-sister stole from him was his sister's phone, that he needed to return it, and that "[h]e was going to do to [Schneider] like he did [Schneider's] sister," which Schneider perceived as a threat. (*Id.* at 98).

**{¶20}** Schneider testified that as Bagley was approaching her car, she opened her car door and got out of her car. (*Id.*). According to Schneider, Fletcher also got out of the car, came around to the driver's side, got between Schneider and Bagley, told Bagley that Bagley was not going to put his hands on

Schneider and "needed to fight a man instead of a female," and slapped himself in the face. (*Id.* at 98-100). Schneider testified that, in response, Bagley said "he was tired of all this stuff that was going on," to which Schneider responded by saying that he did not "need to be running up on a car full of kids." (*Id.* at 100).

{¶21} According to Schneider, Bagley then "swung" at Fletcher's throat, and it looked like Bagley hit Fletcher with the cell phone. (*Id.* at 99-101). At that point, Fletcher leaned back, grabbed his throat, and took off running for the Meat City drive-through across the street. (*Id.* at 100-101). Schneider testified that she could see blood coming down Fletcher's neck when he turned around. (*Id.* at 101). According to Schneider, Fletcher did not touch or strike Bagley in any way, nor did Fletcher have any sort of weapon or object in his hand when he got out of the car. (*Id.* at 102). Schneider did not have a weapon in her car, either. (*Id.* at 103). Schneider testified that after Fletcher ran toward Meat City, Bagley walked toward his house, which was only two houses away. (*Id.* at 102).

{¶22} On cross-examination, Schneider testified that she did not tell Patrolman Justin Wireman of the Lima Police Department, who responded to the scene, that she engaged Bagley; rather, that Bagley engaged her. (*Id.* at 110-111). Schneider testified that she and Bagley were yelling from the start of their argument, and Fletcher was yelling as well when he joined the argument. (*Id.* at 113, 118). During the argument, she opened her car door "the rest of the way"

when she perceived Bagley's hands coming at her, in the window. (*Id.* at 114). She could not recall whether her car door hit Bagley when she opened it; she opened the door to get Bagley away from her car. (*Id.*).

{¶23} Schneider agreed on cross-examination that she "possibly" had the opportunity to drive away rather than continue to argue with Bagley. (*Id.* at 115). Bagley did not make physical contact with Schneider during the argument. (*Id.* at 115-116). Schneider did not tell Fletcher to get out of the car. (*Id.* at 117). According to Schneider, Fletcher did not hit, push, or punch Bagley before Bagley cut Fletcher's throat. (*Id.* at 120). She testified that Bagley made the slashing motion when Fletcher raised his hands from his sides and slapped himself in the face. (*Id.* at 121).

{¶24} On re-direct examination, Schneider testified that she did not lay a hand on or make physical contact with Bagley, aside from her being uncertain about whether her car door hit him as she opened it. (*Id.* at 122-123). She testified that Fletcher did not threaten Bagley in any way when he exited the car and inserted himself between Bagley and Schneider, nor did he make any menacing or aggressive gestures toward Bagley. (*Id.* at 124-125). She also testified that there was nothing blocking Bagley into his position, such as a vehicle or fence, and he had access to turn around and go away the way he came. (*Id.* at 124).

**{¶25}** Fletcher testified that he saw a man who he did not know and had never seen before "come running up at the car." (June 4-5 and 13, 2013 Tr., Vol. Two, at 203-205). According to Fletcher, he was "too busy into [his] phone when [he] was texting" and did not hear any of the conversation between Schneider and the man before Schneider got out of the car and he heard the man say, "I'm going to do to you what I did to your sister." (*Id.* at 203). Fletcher said the man's telling Schneider he was going to do to her what he did to her sister "went straight to [Fletcher's] mind" because "some man had hit [his] sister with a pistol on her face and blacked both of her eyeballs," and his sister "was afraid to even come to [Fletcher's] house because [the man] lived somewhere in the vicinity beside [Fletcher's] house." (*Id.* at 204).

**{¶26}** Fletcher testified that he then got out and ran around the backside of the car, moved Schneider out of the way, slapped himself in his face twice, "got up in the dude's face," and said, "You ain't going to hit my sister. You're going to hit me." (*Id.* at 203, 205). Fletcher testified that he hit himself in the face because he had just gotten off work and "was a little tired," so he "tried to psych [himself] out a little bit, trying to get hyped." (*Id.* at 205). Fletcher was not indicating to the man that the man should hit him, Fletcher testified. (*Id.*).

**{¶27}** According to Fletcher, when he pulled his hands down after hitting himself in the face, the man's hand came up and hit Fletcher in the throat with a

knife, at which point Fletcher saw blood on his hands. (*Id.* at 205-206, 220). Fletcher grabbed his throat, saw the man "going 'yea, yea,'" told the man that he "should have killed" Fletcher, and ran to Meat City across the street. (*Id.* at 206-207). Fletcher testified that he did not touch or hit the man in any way, he did not have a weapon or anything else in his hands when he got out of the car, and he did not tell the man that he had a weapon of any sort. (*Id.* at 207-208).

{¶28} On cross-examination, Fletcher admitted that the man did not push, punch, or make physical contact with Schneider before he intervened, although Schneider and the man were "standing about face-to-face," and "it looked like they were going to fight." (*Id.* at 216). Fletcher testified that when he exited the vehicle, he was "[j]ust trying to be protective" and "wasn't super angry"; he was just "upset" and "wasn't happy that [the man] was talking to [his] sister like that." (*Id.* at 216-217). Fletcher testified that he felt that the man was going to cause Schneider harm because Angie "had already gotten her eye blackened." (*Id.* at 217).

{¶29} According to Fletcher, when Bagley saw him coming around the vehicle, Bagley "just backed up in like a little fighting stance" because Fletcher alarmed him. (*Id.* at 218-219). Fletcher testified that he did not get into a fighting stance, but he slapped himself in the face to get ready to fight. (*Id.* at 219). According to Fletcher, he told Bagley that he should have killed him because

Fletcher knew he would eventually testify in court against Bagley; Fletcher did not have any intentions to cause Bagley harm. (*Id.* at 221).

{¶30} The State also offered the testimony of Peggy and Gary Jennings, who reside in a house next to the Kibby-Harrison intersection. (June 4-5 and 13, 2013 Tr., Vol. One, at 143). Peggy testified that she and her husband had just gotten home from work when they noticed a "heated argument" taking place between a woman in a car (Schneider) and a black male (Bagley) outside the vehicle. (*Id.* at 146). According to Peggy, she saw the woman exit the car and continue arguing with the black male, then a white male (Fletcher) exited the passenger side of the vehicle and went around the back of the car to where the woman and black male were. (*Id.* at 147). Peggy testified that the white male "kind of leaned in," and she "thought they were going to get into an argument," at which point she "saw the black man take his hand towards the white guy." (*Id.*). Peggy thought the black male was "slapping" the white male. (*Id.*). Then, Peggy saw the white male grab his neck and run off. (*Id.*).

{¶31} Peggy testified that the exchange between the white male and the black male was not as heated as the exchange between the woman and the black male. (*Id.* at 148). Peggy had a clear view of the three individuals, such that she could see their bodies as they stood in the street. (*Id.*). Before Peggy saw the black male make the slapping motion toward the white male, the white male did

not strike, punch, hit, or touch the black male in any way, nor did she observe anything assaultive, menacing, or aggressive about the white male's body language or demeanor. (*Id.* at 149). Peggy testified that after the white male ran away, she observed the woman say something to the black male, to which the black male responded, "Yea, I cut him." (*Id.* at 149-150).

{¶32} On cross-examination, Peggy testified that when she observed the white male lean in, she interpreted it as, "If you want to hit somebody, hit me." (*Id.* at 156). She testified that when the white male "leaned in," the black male struck him. (*Id.*). By "lean in," Peggy meant that the white male "just moved his head"—he did not make physical contact with the black male. (*Id.* at 156-157). According to Peggy, the white male "wasn't the aggressor," and she perceived the black male to be the aggressor "because of his demeanor and how he was acting." (*Id.*). She did not see the white male smack himself in the face. (*Id.* at 159).

{¶33} On re-direct examination, Peggy testified that there was nothing behind the black male, such as traffic, blocking him into that position and preventing him from walking away if he wished. (*Id.* at 160).

{¶34} Gary Jennings testified that he and his wife heard a commotion and saw a woman in a car arguing with a black male outside the car. (*Id.* at 163-164). He testified that the woman exited the car, then a white male who was in the car also exited and went around the car to defend the woman and "kind of stuck his

neck out, like, 'you know, if you want to pick on somebody, pick on me.'" (*Id.* at 163-165). He then saw the black male's hand go up toward the white male, and it looked like the black male slapped the white male. (*Id.*). According to Gary, the white male grabbed his neck and ran toward Meat City across the street. (*Id.*). Gary testified that before he grabbed his neck and ran, the white male did not make any aggressive moves toward the black male, nor did he strike, punch, hit, or otherwise lay a hand on the black male. (*Id.* at 165).

{¶35} During cross-examination of one of the State's witnesses, Patrolman Justin Wireman of the Lima Police Department, Wireman testified that Schneider told him that Bagley was just walking down the street before the incident, and she did not tell him that Bagley was coming at her vehicle aggressively. (*Id.* at 50-51). Wireman said Schneider told him that she engaged Bagley, and an argument ensued. (*Id.* at 51-52). Schneider told Wireman that she did not exit the vehicle until after Fletcher fled for Meat City. (*Id.* at 52).

{¶36} Patrolman Brian Snyder of the Lima Police Department testified that he responded to the scene and received information that Bagley was in his house near the intersection, so Snyder "knocked repeatedly" for "several minutes" on the door of Bagley's house—using a forceful knock and announcing in a forceful tone that it was the police—but no one answered. (*Id.* at 55-57). He testified that no one entered or exited Bagley's house after he arrived, and after Bagley exited and

surrendered 20 or 25 minutes after Snyder's arrival, law enforcement entered the house, and they did not find anyone inside the house. (*Id.* at 58-59). Snyder testified that he found a black and silver folding pocket knife in a closed file box in the closet of an upstairs bedroom. (*Id.* at 60-61). Snyder identified State's Exhibits 8, 9, and 10 as photographs of the closet, the file box, and the knife inside the file box as Snyder found it when he opened the file box. (*Id.* at 64-65).

{¶37} The State called Detective Steven Stechschulte of the Lima Police Department, who testified that when he arrived at the scene to investigate, he spoke with Peggy Jennings and Schneider, whose stories of what happened were consistent. (June 4-5 and 13, 2013 Tr., Vol. Two, at 228). According to Stechschulte, he acquired Bagley's phone number from Spring Fugatt, and he then called Bagley and told him they needed to talk. (*Id.* at 229). Stechschulte testified that Bagley "said that he didn't know anything about any stabbing or any type of fight and, in fact, he wasn't even at his house at the time." (*Id.*). Bagley "said that he would be coming back there shortly," Stechschulte testified, and Stechschulte said he would wait on Bagley. (*Id.*). Stechschulte learned from neighbors that someone was in Bagley's house, looking out of an upstairs window as police knocked on the door. (*Id.* at 230). Stechschulte then called Bagley back and told him he knew he was in the house, and Bagley then came out the front door, at

which time Stechschulte had a patrolman take Bagley into custody and transport him to the police department. (*Id.*).

{¶38} Stechschulte testified that Bagley's wife arrived at the house as they took Bagley into custody, and she consented to a search of the house. (*Id.* at 231). Stechschulte identified the Tac Force knife that he and the other officers found concealed in the portable file in Bagley's bedroom closet, the blade of which he said had "remnants of what appeared to be flesh and blood" that ultimately matched Fletcher's DNA. (*Id.* at 232-233, 251-252). Stechschulte testified that based on his experience and training, such a knife is "[a]bsolutely" capable of inflicting death. (*Id.* at 234).

{¶39} Stechschulte identified State's Exhibit 20 as a copy of the surveillance video from Meat City, which Stechschulte acknowledged on cross-examination showed only a portion of what allegedly occurred at the intersection—some of the incident occurred off-screen. (*Id.* at 235-237, 252). The State's counsel played the video for the jury, and Stechschulte said that about five or six seconds before Fletcher can be seen in the video running toward Meat City, he can be seen "backing away." (*Id.* at 238). After Fletcher can be seen running toward Meat City, Bagley can be seen "stand[ing] there in the roadway for a couple of seconds" before walking back toward his residence. (*Id.* at 238-239).

{¶40} Stechschulte identified State's Exhibit 21 as a video of his interview of Bagley on June 27, 2012, an hour or hour and 15 minutes after the incident. (*Id.* at 241). In the interview, Bagley begins by stating that the incident occurred in his front yard before later acknowledging that it occurred at the intersection. (State's Ex. 21). Bagley told Stechschulte that he noticed a bat in the back seat of Schneider's car. (*Id.*). Bagley also said that he did not come out of his house right away because he was inside with his 13-year-old son, Jeffrey, and he was waiting for his wife to come home. (*Id.*); (June 4-5 and 13, 2013 Tr., Vol. Two, at 245). Bagley said, "I've never been scared of jail—did 20 years straight for something I didn't do." (State's Ex. 21). Stechschulte testified that their search did not reveal a child in the house, and his investigation revealed that Bagley has an adult son name Jeffrey, but he lives in Florida and has not been to Ohio for several years. (June 4-5 and 13, 2013 Tr., Vol. Two, at 245). At the end of the interview, in response to Stechschulte questioning his truthfulness, Bagley shouted, "Yes, I cut him! Fuck him!" (State's Ex. 21). A couple seconds later, Bagley added, "He shouldn't have hit me in my jaw. You gonna do something about that?" (*Id.*).

{¶41} Stechschulte identified State's Exhibit 22 as a video of his interview of Bagley on June 29, 2012, two days after the incident. (June 4-5 and 13, 2013 Tr., Vol. Two, at 246). In that interview, Bagley explained his version of the events, saying Fletcher "throw his hands up, swing at me, hit me. I cut him. Self-

defense, man." (State's Ex. 22). At another point in the interview, Bagley told Stechschulte, "You hit me, I'm gonna do what I gotta take to defend myself," and, "Flat out, point blank, man: I don't sit and wait to take chances, man." (*Id.*). When Stechschulte told Bagley that the law did not allow him to use a deadly weapon in a fistfight, Bagley said that Fletcher was taller than him. (*Id.*). Throughout the interview, Stechschulte questioned Bagley under the assumption that Fletcher punched Bagley or was the aggressor, but Stechschulte testified that he used that assumption as an "interview technique" and did not actually believe that, and the evidence that Stechschulte uncovered in his investigation "showed all to the contrary." (June 4-5 and 13, 2013 Tr., Vol. Two, at 248, 254).

{¶42} The defense offered the testimony of one witness, Richard Commons, who testified that he was in the Meat City parking lot when he observed an argument occurring in the street at the nearby intersection of Kibby and Harrison. (*Id.* at 276, 278). According to Commons, the argument began with a black male (Bagley) outside the car and a white female (Schneider) and a white male (Fletcher) inside the car. (*Id.* at 276-278). Commons testified that he "never observed [the white female] at any time out of the car," but the white male did get out of the car. (*Id.* at 278). According to Commons, "the black guy was backing up and the white guy ran around the car, like, like he was going to attack the guy," and the black male turned and swung his arm. (*Id.* at 278-279).

-20-

{¶43} Commons observed the Meat City video surveillance video before testifying, and he testified that the video did not capture the entire incident. (*Id.* at 279-280). He testified that he came forward because he saw a newspaper story about Bagley's trial, which jogged his memory of the incident, which was inconsistent with Bagley's felonious-assault charge. (*Id.* at 282).

{¶44} On cross-examination, Commons testified that from his position, the white male did not touch the black male before the black male swung at the white male, nor did the white male have any weapon or other object in his hand. (*Id.* at 293-294).

{¶45} We conclude that the jury did not lose its way as to Bagley's self-defense assertion. There was conflicting evidence concerning the first element of self-defense—that is, whether Bagley was at fault in creating the situation giving rise to the affray. However, the overwhelming weight of the evidence is not in Bagley's favor concerning the second and third elements of self-defense.

{¶46} We address the third element first. "[T]here is a duty to retreat before using deadly force unless one is in his home or business." *State v. Ross*, 3d Dist. Marion No. 9-91-3, 1991 WL 216454, *3 (Oct. 23, 1991), citing *State v. Jackson*, 22 Ohio St.3d 281 (1986). Here, the altercation took place in Harrison Avenue, so Bagley had a duty to retreat before using deadly force. Schneider and Peggy Jennings testified that there was nothing impeding Bagley's

ability to retreat, and he had a clear path back to his house. There was no evidence to the contrary. Therefore, Bagley did not prove the third element of self-defense.

**{¶47}** To satisfy the second element of self-defense, Bagley was required to prove by a preponderance of the evidence that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that the only means of escape from that danger was in the use of deadly force on Fletcher. In considering whether a defendant proved the second element, the jury must consider all the circumstances to see whether the defendant had an objective reasonable belief of imminent danger of death or great bodily harm and if he possessed a subjective, honest belief that he was in imminent danger of death or great bodily harm. *See State v. Inman*, 9th Dist. Medina No. 03CA0099-M, 2004-Ohio-1420, ¶ 9, citing *State v. Thomas*, 77 Ohio St.3d 323, 330-331 (1997); *State v. Ludt*, 180 Ohio App.3d 672, 2009-Ohio-416, ¶ 22 (7th Dist.). A defendant may use only as much force as is reasonably necessary to repel the attack. *Belanger*, 190 Ohio App.3d 377, at ¶ 4; *State v. Ingram*, 10th Dist. Franklin No. 11AP-1124, 2012-Ohio-4075, ¶ 30.

**{¶48}** Here, there is no evidence that Bagley possessed the necessary objective and subjective beliefs. Even setting aside the question of who the aggressor was, Schneider, Fletcher, and even Commons testified that Fletcher did not have any sort of weapon in his hands when he got out of the car and

approached Bagley, nor did he lead Bagley to believe he did. Rather, Fletcher slapped himself in the face to wake himself up for a fistfight. While Bagley said in his interviews with Stechschulte that he saw a bat in the back seat of Schneider's car and that Fletcher is taller than him, these observations were not enough to justify using a deadly weapon, such as a knife. Furthermore, because Bagley's story changed so dramatically during Stechschulte's investigation, the jury may have chosen to discredit his interview statements. For these reasons, the jury did not lose its way by finding that it was not objectively reasonable for Bagley to believe he was in imminent danger of death or great bodily harm.

{¶49} Nor did Bagley establish that he had the subjective, honest belief that he was in imminent danger of death or great bodily harm. Schneider, Fletcher, and Peggy and Gary Jennings testified that Bagley was the aggressor, compared to Commons who testified that he perceived Fletcher as the aggressor. However, as Stechschulte pointed out in his testimony, the Meat City surveillance video reveals that, contrary to Commons' recollection, it was Fletcher who was backing away from Bagley just before Bagley pulled the knife—not the other way around. Moreover, Bagley's statements in his interviews with Stechschulte revealed that he believed he was justified in using any means to defend himself, regardless of the level of force used against him, saying, "You hit me, I'm gonna do what I gotta take to defend myself." (State's Ex. 22). Finally, Bagley's not answering

the door when police were knocking, his hiding the knife, and his constantly evolving version of the events suggest that he knew what he did was not lawful. In short, nothing in the record supports that Bagley believed he was in imminent danger of death or great bodily harm.

{¶50} For these reasons, Bagley failed to prove at least two of the elements of self-defense, and we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Bagley's felonious-assault conviction must be reversed and a new trial ordered.

{¶51} Bagley's third assignment of error is overruled.

### Assignment of Error No. IV

**The trial court erred in allowing a part of the interview between the defendant and the investigating detective to be played for the jury during the State of Ohio's case in chief that references the defendant's prior incarceration in state prison.**

{¶52} In his fourth assignment of error, Bagley argues that the trial court erred by allowing the State to play the portion of the video of his first interview with Stechschulte in which Bagley said, "I've never been scared of jail—did 20 years straight for something I didn't do." (State's Ex. 21). Specifically, Bagley argues that evidence of his prior incarceration was impermissible character evidence under Evid.R. 404. The trial court ruled that Bagley's prior-incarceration reference was admissible under Evid.R. 404(B) for purposes other than to prove

Bagley's character and that the evidence was not unfairly prejudicial under Evid.R. 403.

{¶53} We apply a plain-error standard of review to this assignment of error. "'[T]he denial of a motion *in limine* does not preserve a claimed error for review in the absence of a contemporaneous objection at trial.'" *Hancock*, 108 Ohio St.3d 57, at ¶ 59, quoting *State v. Hill*, 75 Ohio St.3d 195, 203 (1996). In other words, if the party wishing to exclude evidence fails to contemporaneously object at trial when the evidence is presented, that party waives for appeal all but plain error. *See id.* at ¶ 59-60; *State v. Barrett*, 4th Dist. Scioto No. 03CA2889, 2004-Ohio-2064, ¶ 20; *State v. Lenoir*, 2d Dist. Montgomery No. 22239, 2008-Ohio-1984, ¶ 19.

{¶54} Bagley's counsel "objected" to the prior-incarceration reference outside of the presence of the jury at the conclusion of the first day of trial, asking that it "be redacted," and he reiterated his "objection" the morning of the second day of trial before the trial court ruled on the objection and brought the jury into the courtroom. (June 4-5 and 13, 2013 Tr., Vol. One, at 169-175); (June 4-5 and 13, 2013 Tr., Vol. Two, at 185). However, when the State played the video of Bagley's first interview, State's Exhibit 21, which included Bagley's prior-incarceration reference, Bagley's counsel did not object. (June 4-5 and 13, 2013 Tr., Vol. Two, at 242). Nor did Bagley's counsel object when the State moved for

the admission of its exhibits. (*Id.* at 257). Because Bagley failed to object at the time the evidence was introduced, we apply plain-error review.

{¶55} Crim.R. 52(B) governs plain-error review in criminal cases. *State v. Risner*, 73 Ohio App.3d 19, 24 (3d Dist.1991). For there to be plain error under Crim.R. 52(B), the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain-error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58 (1990). We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 110 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶56} "Evid.R. 404(B) provides that '[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.'" *State v. May*, 3d Dist. Logan No. 8-11-19, 2012-Ohio-5128, ¶ 69. "However, there are exceptions to the general rule: 'It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Id.*,

quoting Evid.R. 404(B). "The list of acceptable reasons for admitting testimony of prior bad acts into evidence is non-exhaustive." *State v. Persohn*, 7th Dist. Columbiana No. 11 CO 37, 2012-Ohio-6091, ¶ 23, citing *State v. Melton*, 11th Dist. Lake No. 2009-L-078, 2010-Ohio-1278, ¶ 78. *See also State v. Faye*, 3d Dist. Wyandot Nos. 16-99-08 and 16-99-09, 2000 WL 566741, *4 (May 4, 2000).

**{¶57}** In *State v. Williams*, the Supreme Court of Ohio set forth the three-step analysis trial courts should conduct in determining whether "other acts" evidence is admissible under Evid.R. 404(B). 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 19-20. "The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.*, citing Evid.R. 401. "The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* "The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Evid.R. 403.

**{¶58}** As for the first step, Bagley's theory of the case was that he cut Fletcher in self-defense, which is an affirmative defense. "'The defendant's state

-27-

of mind is crucial to this defense.'" *Ludt*, 180 Ohio App.3d 672, at ¶ 22, quoting *State v. Koss*, 49 Ohio St.3d 213, 215 (1990). *See also Thacker*, 2004-Ohio-1047, at ¶ 22 ("The statement was relevant to show motive, Thacker's state of mind at the time of the stabbing and to rebut Thacker's claim of self-defense.").

{¶59} Bagley made his assertion, "I've never been scared of jail—did 20 years straight for something I didn't do," while explaining in his first interview with Stechschulte—which took place only an hour or an hour and 15 minutes after Bagley cut Fletcher—why it took him several minutes to answer the door after repeated knocking by officers. His statement that he is not scared of jail—particularly considering his statement in his second interview, "You hit me, I'm gonna do what I gotta take to defend myself"—was relevant to his state of mind, intent, and motive, and specifically whether he possessed the requisite subjective, honest belief that he was in imminent danger of death or great bodily harm, or whether he did what he believed he needed to do to defend himself, regardless of whether it was lawful and regardless of whether he may go to jail for it.

{¶60} Under the second step from *Williams*, the record reflects that the State did not present the prior-incarceration reference to prove that because Bagley committed a crime in the past and was incarcerated, he must have committed the offense of felonious assault in this case. Rather, as we stated above, Bagley's prior-incarceration statement was used to prove his state of mind and, specifically,

his intent and motive at the time he cut Fletcher's throat, which are permissible reasons under Evid.R. 404(B) for admitting other-acts evidence. *See* Evid.R. 404(B).

{¶61} Under the third step from *Williams*, the record reflects that the probative value of Bagley's prior-incarceration reference was not outweighed by the danger of unfair prejudice. "Only in rare cases are an accused's own actions or language unfairly prejudicial." *State v. Lee*, 10th Dist. Franklin No. 06AP-226, 2007-Ohio-1594, ¶ 7, citing *State v. Bailey*, 10th Dist. Franklin No. 04AP-553, 2005-Ohio-4068, ¶ 11.

{¶62} After the State played the video of Bagley's first interview, the trial court thoroughly instructed the jury concerning the limited purposes for which it could consider the prior-incarceration reference, saying:

> If you find that the evidence that the defendant previously served a
> prison term is true you may consider that evidence only for the
> purpose of deciding whether it proves the defendant's motive, or his
> intent, or his purpose to commit the offense charged in this trial.
> This evidence cannot be considered for any other purpose.

(June 4-5 and 13, 2013 Tr., Vol. Two, at 243). Given that the prior-incarceration reference came from Bagley, that there were legitimate purposes under Evid.R. 401 and 404(B) for admitting it, the limiting instruction, which we presume the

jury followed absent evidence to contrary, and the overwhelming evidence of guilt, we cannot conclude that the trial court's admission of the prior-incarceration reference amounted to plain error. *See State v. Perkins*, 3d Dist. Hancock No. 5-13-01, 2014-Ohio-752, ¶ 71.

**{¶63}** Bagley's fourth assignment of error is overruled.

**Assignment of Error No. V**

**The trial court erred in allowing a part of the interview between the defendant and the investigating detective to be played for the jury during the State of Ohio's case in chief that references the opinions of the investigative police officer that the defendant is, or is not telling the truth.**

**{¶64}** In his fifth assignment of error, Bagley argues that the trial court erred by allowing the State to play the portion of his interview with Stechschulte in which Stechschulte questions the truthfulness of Bagley's version of the events and insinuates that Bagley is lying. Bagley does not specify whether he is referring to his June 27, 2012 interview or his June 29, 2012 interview, nor does he cite or excerpt any particular portion of a video.

**{¶65}** Because Bagley failed to object to the admission of the interview videos when the State presented them at trial, we apply the plain-error standard of review that we explained above. (June 4-5 and 13, 2013 Tr., Vol. Two, at 242, 247-248, 257). *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 116.

**{¶66}** In support of his argument, Bagley cites the rule that "[a] police officer's opinion that an accused is being untruthful is inadmissible." (Appellant's Brief at 21, quoting *Davis* at ¶ 122). However, the rule from *Davis* that Bagley cites applies to testimony, not videos of interviews. *See Davis* at ¶ 121-123. Moreover, although the Supreme Court of Ohio in *Davis* concluded that the detective's trial testimony that the defendant "was being very deceptive" was erroneously admitted, its admission "did not result in plain error" because "[t]here was overwhelming evidence of Davis's guilt." *Id.*

**{¶67}** Here, we conclude that the admission of the videos of Bagley's interviews did not result in plain error. As we discussed above, there was overwhelming evidence of Bagley's guilt. Bagley does not point to any particular portion or portions of either interview that he finds objectionable. In fact, the videos of the interviews reflect that the interviewing detective, Stechschulte, used several interrogation techniques, and his statements and questions, to which Bagley responded, provide a context for Bagley's statements and admissions. Finally, Stechschulte was subject to cross-examination at trial. For these reasons, we cannot conclude that the admission of the videos of Bagley's interviews constituted the exceptional circumstance of plain error. *See State v. Gray*, 9th Dist. 08CA0057, 2009-Ohio-3165, ¶ 16-17 ("[W]e cannot conclude that the

inclusion of the officers' unredacted statements during their interview prejudiced Gray, or constituted the 'exceptional circumstance' of plain error.").

{¶68} Bagley's fifth assignment of error is overruled.

## Assignment of Error No. I

**By judicial fact finding and imposing consecutive sentences for the repeat violent offender specification, the court has violated the defendant's right to a trial by jury pursuant to the Sixth Amendment of the United States Constitution.**

## Assignment of Error No. II

**The trial court's reception of new evidence to support the prior conviction elements of the repeat violent offender specification after the trial had already terminated violated defendant-appellant's rights under the Double Jeopardy Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.**

{¶69} In his first assignment of error, Bagley argues that the trial court violated his right to a jury trial under the Sixth Amendment of the United States Constitution by imposing an additional definite prison term under R.C. 2929.14(B)(2)(a) after concluding under R.C. 2941.149 that he was an RVO as defined in R.C. 2929.01(CC). In his second assignment of error, Bagley argues that by allowing the State to present evidence of his prior conviction for attempted rape in 1984 and then concluding he was an RVO, all after the jury had returned its verdict, the trial court violated Bagley's right to be free from double jeopardy under the Fifth and Fourteenth Amendments to the United States Constitution.

**{¶70}** "'The question of constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution this means in the trial court.'" *State v. Rowland*, 3d Dist. Hancock No. 5-01-28, 2002 WL 479163, *1 (Mar. 29, 2002), quoting *State v. Awan*, 22 Ohio St.3d 120, 122 (1986). This applies to challenges to the facial constitutionality of a statute and to the constitutionality of a statute's application. *See Awan* at syllabus. "If a party fails to object to a constitutional issue at trial, an appellate court need not consider the objection for the first time on appeal." *Rowland* at *1, citing *Awan* at syllabus. *See also State v. Watkins*, 2d Dist. Champaign No. 04CA12, 2005-Ohio-1378, ¶ 30 (declining to address defendant-appellant's argument that the trial court's findings made pursuant to R.C. 2929.14(B)(2) and 2929.14(C) violated his Sixth Amendment rights because defendant-appellant did not raise his constitutional argument in the trial court); *State v. Johnson*, 2d Dist. Montgomery No. 21332, 2006-Ohio-4934, ¶ 20 (declining to address defendant-appellant's argument that his conviction for having weapons while under a disability violated his rights against double jeopardy because defendant-appellant failed to raise his constitutional argument in the trial court).

**{¶71}** Here, our review of the record reflects that Bagley is attempting to, on appeal, raise his arguments under his first and second assignments of error for the first time. While the case was pending before the trial court, Bagley did not

object to the constitutionality of the statutes he now attempts to challenge, nor did he challenge the trial court's application of those statutes at the RVO and sentencing hearings. (*See, e.g.,* June 25, 2013 Tr. at 16 (Defense Counsel: "I'm not going to make any argument regarding the R.V.O. I'd leave it up to the Court.")). Therefore, Bagley has waived these arguments, and, under *Awan*, we decline to address them. *See Rowland* at \*1.

{¶72} Bagley's first and second assignments of error are overruled.

{¶73} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, J., concurs.**

**ROGERS, J., concurs; concurs in Judgment Only as to Assignment of Error No. 4.**
**/jlr**